# SOLEY *v.* HEBBARD.

PATENTS; CONCEPTION OF IDEA; REDUCTION TO PRACTICE;
BURDEN OF PROOF.

1. The person who first reduces an idea embodied in an invention
to practical shape and form is to be regarded as the first
and original inventor in contemplation of law, although the
idea may have been previously entertained by others.
2. Where the idea embodied in an invention is conceived by one per-
son and communicated to another, who reduces it to practice,
the party conceiving the idea is entitled to the benefit of his
conception, and the reduction to practice by the party to whom
the idea was communicated will inure to his benefit.
3. But the burden of proving such communication is upon the party
asserting it.

Patent Appeals, No. 18. Submitted November 18, 1894. Decided January 7, 1895.

HEARING on an appeal from a decision of the Commis-
sioner of Patents in an interference proceeding. *Affirmed.*

The COURT in its opinion stated the facts as follows:

This is an appeal from the decision of the Commissioner
of Patents in a case of interference between rival applicants
for a patent for the invention of a machine for manufactur-
ing composition targets.

On November 4, 1892, the appellee, Albert H. Hebbard,
filed his application in the Patent Office for letters patent
for an invention in the construction of machines for the
manufacture of composition targets, which he claimed to
have conceived in July, 1891, and to have reduced to prac-
tice in March or April of 1892. The specification of his
claims, after various amendments, was ultimately defined as
follows:

" 1. In a machine for making composition targets, the
combination of a plunger, a device for feeding composition,

a carriage, a rotary mold-block carried thereby, and mechanism for moving said carriage wherein the said mold-block coincides with the said plunger and the said feed device alternately, substantially as described.

"2. In a machine for making composition targets, the combination of a plunger, a composition feeding device, a rotary mold-block having a series of molds, a reciprocating carriage for carrying the mold-block into alternate coincidence with the plunger and feeding device, and mechanism for intermittingly rotating the mold-block in one direction when moving from the plunger towards the feed, substantially as described.

"3. In a machine for making composition targets, the combination of two plungers, a central feed, two mold-blocks adapted to coincide with one plunger and the feed simultaneously, and a carriage for moving said blocks into alternate coincidence with the plunger, substantially as described.

"4. In a machine for making composition targets, the combination of two plungers, a central feed, two rotary mold-blocks containing a series of molds rotating in vertical planes, a mechanism for intermittently rotating said blocks into position for feeding, compressing, cooling and dropping the work, substantially as described.

"5. In a machine for making composition targets, the combination of a plunger, a mold-block, and means for moving the mold-block into and out of coincidence with the plunger, an automatic composition feeding device having coincidence with the mold-block when it is out of coincidence with the plunger, said feed device consisting essentially of means for establishing a passage from the composition supply tank to the mold-block when it is in coincidence therewith, substantially as described."

Upon this application an interference was declared on March 17, 1893, between the applicant and one John W. Dunbar, to whom a patent for a similar invention had

been issued on November 15, 1892, and who, in his application filed on August 26, 1892, had stated that he had conceived the idea of the invention on or about April 19, 1892, and almost immediately reduced it to practice.

Subsequently, on April 20, 1893, William H. Soley, the present appellant, filed his petition in the Patent Office, claiming to be the author of the same invention, and alleging that he had conceived the idea of the invention between the 10th and 15th of March, 1890, and immediately communicated it to several persons. He did not reduce it to practice himself, but he claimed that it was his idea that was communicated to Hebbard, and reduced to practice by the latter, and that this reduction to practice should inure to his (Soley's) benefit. Thereupon, a triangular interference was declared on May 6, 1893, between Hebbard, Dunbar and Soley.

Testimony was taken, and the controversy came on for determination in the Patent Office. The examiner of interferences decided in favor of Hebbard, and against both Soley and Dunbar. The last named did not appeal from the decision, and he is presumed to have acquiesced in it. This acquiescence was undoubtedly the dictate of prudence, inasmuch as the testimony and his own admission showed quite conclusively that he was not the inventor of the invention for which he had received his patent, and his application for the patent had been without justification. He has dropped out of the case.

Soley appealed from the decision of the examiner of interferences to the board of examiners in chief, and that board affirmed in part and reversed in part the decision of the examiner. It affirmed the decision as to the claims numbered three, four, and five and reversed it as to claims numbered one and two. Claims numbered three, four, and five, it may be noted, are merely for a duplication of the mechanism involved in claims numbered one and two, and it is now fully understood and conceded by all parties that,

while Soley still claims to be the inventor of the inventions mentioned in claims numbered one and two, the other three claims are fully conceded to Hebbard, and for those, at all events, if not for all five of the claims, he is entitled to a patent.

From the decision of the board of examiners awarding claims numbered one and two to Soley, Hebbard appealed to the Commissioner of Patents, and the Commissioner reversed the decision, sustained the decision of the examiner of interferences, and awarded to Hebbard the right to a patent for all the claims—those numbered one and two, as well as the others. From this decision the present appeal to this court has been taken.

*Messrs. Graham & Low* for the appellant.

*Mr. H. C. Lord* and *Mr. John K. Hallock* for the appellee.

Mr. Justice Morris delivered the opinion of the Court:

There are some facts in the case with reference to which there is no controversy—at all events, no substantial controversy. One of these is that the invention of Soley and Hebbard is substantially and practically the same. A second is that Soley's conception of the idea embodied in the invention antedated that of Hebbard. And a third is that Soley never reduced the idea to practice, and that Hebbard did reduce it to practice, and produced a working machine. The claim of Soley is that his idea was communicated to Hebbard; that it was acted on by the latter, and that Hebbard's reduction of it to practice should inure to the benefit of Soley. The claim of Hebbard, on the other hand, is that he had never heard of Soley, or of Soley's invention, until after his own application for a patent had been filed; that he had never received any communication from him of his idea, either directly or indirectly, and that his invention was his own, sole, and exclusive conception. The issue, therefore, between them is very sharply defined, and is reduced to the deter-

mination of a single question of fact, whether Soley's conception was communicated to Hebbard and was embodied by the latter in his perfected machine. If there was such communication, Soley is entitled to the benefit of his conception; if there was no such communication, Hebbard must be regarded as an independent inventor; and, although subsequent to Soley in the conception of the idea, he must, in that event, be regarded in contemplation of law as the first and original inventor, inasmuch as he was confessedly the first to reduce the idea to practice. The question, as we have said, is one of fact, to be determined by the testimony; and the principles of law applicable to it are few and simple.

We have to regret, however, that the testimony is not as clear and decisive as it should be. Charges of perjury and subornation of perjury are freely made on both sides, and apparently not without some justification. But this is a most uninviting field of inquiry; and we think the question at issue may be solved in this case without much regard to the main mass of the testimony on either side.

We may start out with the premises, that Hebbard had the idea of the invention for which a patent is sought, and reduced it to practice; and that he is, therefore, to be regarded as the *prima facie* inventor, Soley not having himself reduced it to practice; for it is well settled law, universally conceded, that it is the person who first reduces an idea to practical shape and form who is to be regarded as the first and original inventor in contemplation of law, notwithstanding that the idea may have been previously entertained by others. Moreover, Hebbard's application for a patent was the first in the order of time. Under these circumstances, Hebbard is in the position of a defendant in possession, with the *prima facie* right of ownership by virtue of his possession; and it is incumbent upon any one who would dispute his right to establish an antagonistic title by a clear and fair preponderence of evidence. It will not do merely to raise a doubt, so as to render a defendant's right questionable. There must

be a reasonable preponderence of evidence, in order to over-
come the presumption of right arising from the fact of
possession.   The burden of proof in the present case is upon
the appellant Soley to show that his (Soley's) idea was actually
communicated to Hebbard, and acted upon by the latter;
and if he fails to make such proof his claim cannot be sus-
tained, and the appellee must be left in the possession of the
invention where we find him.   Has the appellant so made
out his case?

It would serve no good purpose to analyze the testimony
at length; but there are some salient facts to which we
may advert.

Prior to the autumn of 1890, Hebbard had been the
president and principal stockholder of a company known as
the Standard Target Company, established at Cleveland in
the State of Ohio, for the manufacture of composition tar-
gets, as they are called—artificial targets to take the place
of birds for the benefit of sportsmen; and had taken out
some patents for the manufacture of machines to make
these targets.   At the same time, one Hallock A. Penrose
was the president and principal stockholder of a similar
company, known as the Keystone Target Company, estab-
lished for a similar purpose at Corry in the State of Penn-
sylvania.   There was considerable competition between
them, although the Cleveland company was in an embar-
rassed and practically bankrupt condition.   Negotiations
were initiated in the spring or early summer of 1890, and
carried to a practical conclusion in the autumn of the same
year, for a consolidation of the two companies, with the
result that a new company was established by the parties
in interest out of the two previously existing organizations
under the name of the Standard Keystone Target Company,
with its principal office in the city of New York, and its
factory at New London in the State of Connecticut.   Pen-
rose became president of the new company, and Hebbard

became superintendent of the factory at New London. Dissensions, however, arose before very long between Penrose and Hebbard; and the latter, about July 20, 1892, left the Standard Keystone Company, went to Elizabeth, in the State of New Jersey, and there became superintendent of another similar organization, the Empire Target Company. Penrose reorganized and continued his company at New London.

About the middle of March, 1890, which was some time before the attempted consolidation of the two companies at Cleveland and Corry, Penrose went to a factory in or near Philadelphia for the purpose of having a machine manufactured there to make composition targets, taking with him a patent that had been issued to David Swan, one of his employees at Corry, and which had been assigned to Penrose, as the model from which the machine was to be constructed. The factory belonged to William Wolstencroft & Sons, some of whom afterwards became associated with Penrose in his factory at New London. The Wolstencrofts introduced Penrose to one of their machinists, William H. Soley, the appellant in this case; and to him Penrose stated what he desired. Upon inspection of the Swan patent and the drawings annexed to it, Soley found it quite objectionable, and suggested to Penrose that he could construct for him a machine that would be free from the difficulties apparent to him in the Swan patent. He then and there drew a sketch of what he proposed, and handed it to Penrose; and Penrose took it away with him. Nothing further apparently came of the matter at the time. Soley was not employed to make the machine, or to give any effect to his own idea. He states in his testimony that he gave the sketch to Penrose "to do as he pleased with," although he now claims that he did not thereby intend to abandon the invention, and that he understood that the sketch was to be submitted by Penrose to his own machinist for the opinion of the latter. And when he was asked why he had not

in due course of time applied for a patent, his statement was that the Wolstencrofts attended to all patents for him. The Wolstencrofts, however, do not confirm this statement; and there is no proof of their ever having taken out any patents for Soley or on his account. At all events, there was no movement by Soley, or by anyone on his behalf, to follow up his invention in any manner until after the lapse of about three years, in April, 1893, when his application was filed in this case. Penrose and Hebbard had then quarrelled; and Penrose immediately appeared as the assignee both of Dunbar's unfounded patent and of Soley's rights, whatever they were. Penrose, therefore, and not Soley, is the real party in interest; and the controversy is, in fact, a contest between him and Hebbard. Soley is only a nominal party, although a proper one. The relation of the parties, however, is proper to be remembered in our estimation of the testimony.

Penrose claims that he communicated Soley's idea to Hebbard, and gave to the latter the sketch that had been given to himself by Soley. Hebbard positively denies that there was ever any such communication to him by Penrose or by any one else, or that he had ever seen the sketch, or that he had ever heard of Soley or of his invention, before he made his own application in this case for a patent. This is substantially all the direct testimony there is upon this vital point of the controversy; and the indirect testimony that is supposed to bear upon it does not seem to us to weigh much upon one side or the other. Inasmuch as the interview between Penrose and Soley occurred several months before the consolidation of the two companies controlled respectively by Penrose and Hebbard, and consequently a considerable time before there were any such business relations between these two as would warrant such a communication to Hebbard, it is only reasonable to suppose that Soley's sketch and Soley's idea were communicated by Penrose, not to Hebbard, but to Swan, his machinist

at the time, and that for some reason they were cast aside, and never afterwards taken up. Indeed, Penrose admits that his first communication of the Soley process was to Swan, and that it was abandoned for the time being in consequence of objection by Swan. He claims, however, that after the consolidation it was taken up again, and prosecuted to success by Hebbard.

But there are two conceded facts that go far to show that Penrose is mistaken in this matter, and that he should be precluded from contesting Hebbard's right. The first is that before Hebbard had made his application and while he was still in the employment of the New London Company, Penrose had admitted the invention to be that of Hebbard, and had entered into an agreement with him for a consideration to take an assignment of one-half interest in the patent that should be procured therefor by him; and the second is, that after the application had been made by Hebbard and before there arose any final disagreement between him and Penrose, the latter, on June 30, 1892, wrote to the attorneys in Washington, who were soliciting the patent for Hebbard, a letter, in which he positively and unequivocally admitted the invention to be that of Hebbard, and that Hebbard was to assign one-half interest to him. Neither then nor for several months afterwards was there any mention whatever of Soley. And yet, if Penrose then knew Soley to have been the true inventor, and not Hebbard, as he must have known, if his present claim is well founded, it was his duty at that time to recognize Soley's right. His attempt to push the application for Hebbard would have to be regarded as a fraud upon Soley. It is sought to excuse or defend his action on the ground that he was ignorant of the patent laws, and apparently also of the Constitution of the United States. But if ever the maxim applies that ignorance of the law shall excuse no man, the present is the proper occasion for its application. That an employer may assume that he may allot the brain work of his employees as he pleases, and

take out in the name of one a patent for an invention which he knows to have been made by another, because it may in some way suit his convenience so to do, is an assumption that must be repudiated by the common sense of mankind.

We have said that, in our opinion, it was incumbent upon the appellant, or upon his assignee acting for him, to show by a preponderance of evidence that the *prima facie* right existing in the appellee should be subordinated to some better right existing in the appellant; and that, unless there is such a preponderance, the cause of the appellee, as that of a defendant in possession, should prevail. We are disposed, with the Commissioner of Patents, to regard the preponderance of evidence as being with the appellee. No such case has been made out by the appellant as would warrant us to regard the presumption in favor of the appellee as overcome; nor do we find any reason to disturb the decision of the Commissioner.

*The decision of the Commissioner of Patents is, therefore, affirmed. And the clerk will certify this opinion and the proceedings in this cause to the Commissioner of Patents, according to law.*